CRAIG FOOD INDUSTRIES,
INC., Plaintiff,

v.

TACO TIME INTERNATIONAL,
INC., Defendant.

No. NC 78–0011.

United States District Court,
D. Utah, N. D.

April 2, 1979.

Pete N. Vlahos and David J. Knowlton, Ogden, Utah, for plaintiff.

K. Patrick Neill, Eugene Or., Gordon Campbell, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION

ALDON J. ANDERSON, Chief Judge.

Non-jury trial of the present action was conducted on September 25 and subsequent dates in September, October, and November of 1978. Final arguments were concluded on November 24, and the court took the entire matter under advisement at that time.

## JURISDICTION AND VENUE

This action was commenced in state court on or about April 30, 1976, when Craig Food Industries, Inc. (CFI) filed suit against Taco Time International, Inc. (TTI) for a declaratory judgment as to certain disputed matters arising out of a licensing agreement between the parties. Although the action was at that point removable on the basis of diversity of citizenship, TTI made no effort to remove the action to federal court. On June 28, 1976, TTI filed an answer and counterclaim in state court. On December 7, 1977, TTI filed a motion for leave to amend its counterclaim to allege numerous additional breaches by CFI. On December 23, CFI filed a motion for leave to file an amended complaint in the event that TTI should be allowed to file an amended counterclaim. On January 18, 1978, the state court granted the motions for leave to amend. On January 24, CFI filed a "second amended complaint," which included an allegation that the Taco Time trademark was "no longer subject to the protection of the Lanham Act." (Seventh Count.) This allegation had not been made previously in this action (except in the proposed amended complaint filed in connection with the motion for leave to file an amended complaint).

On January 31, 1978, TTI filed a petition for removal of the action to this court on the basis of the trademark claim arising under federal law. On February 7, CFI filed an "objection to petition for removal," but did not file a motion to remand. On February 24, CFI filed a motion to strike from its second amended complaint all allegations relating to its trademark claim. (Seventh Count.) On March 7, the court granted the motion to strike.

Throughout most of the litigation of this action in this court, CFI has maintained that the court lacks jurisdiction because removal was not timely. (*E.g.*, Pretrial Order [First Draft], dated July 14, 1978; Pretrial Order [Final] dated August 9, 1978.) In its proposed findings of fact and conclusions of law submitted on or about November 6, CFI took the position that the court has jurisdiction. (¶ 3.)

In view of the conflicting positions asserted by CFI as to jurisdiction, the court deems it appropriate to reach an explicit resolution of the jurisdictional issue despite CFI's apparent waiver of its objections to this court's jurisdiction. It is undisputed that jurisdiction of this action could properly be based on diversity of citizenship and requisite amount in controversy if removal was timely. Since TTI did not remove within thirty days from the filing of this action, which was removable at the outset, its subsequent removal did not satisfy the literal terms of 28 U.S.C. § 1446(b), requiring removal within thirty days after receipt by the defendant of the initial pleading or service of summons.

The courts, however, have expanded removal jurisdiction with the doctrine that if the amendment of the complaint provides a new basis for removal or makes the action a "new suit," the thirty-day removal period begins to run anew from the date of service of the amended complaint on the defendant. *E.g.*, 14 Wright, Miller & Cooper, Federal Practice & Procedure § 3732, at 728 (1976). In this case, CFI's second amended complaint (filed on January 24, 1978) stated a claim arising under federal law, thereby providing a new basis for removal. TTI's petition for removal was filed on January 31, 1978, well within the thirty-day period. Thus, removal of this action was timely and proper.

Even though the court later granted CFI's motion to strike its federal claim, the court was not thereby deprived of jurisdiction of the remaining claims of the parties. *E.g., id.,* § 3739, at 761.

The parties agree that venue is properly laid in this court's Northern Division.

## HISTORY OF THE DISPUTE

The present relationship of CFI and TTI has evolved gradually during a period of nearly fourteen years. In 1965, Ed Craig (now president and chairman of board of CFI) and his wife purchased a Taco Time subfranchise in Spokane, Washington from National Taco Company ("Nataco"—now TTI) and Evan Armstrong for $18,000. (P–1132.) At that time, the Taco Time business had been in existence for five years and had about fifteen stores in operation. Also in 1965, Craig entered into a "franchise agreement" with Nataco under which he was obligated to open four Taco Time restaurants in Utah by July 1, 1969. (D–323.) Pursuant thereto, Craig opened at least five stores in Utah by 1969. (D–138.)

On March 25, 1968, Ed and Gil Craig entered into an "area license agreement" with Nataco, granting them the exclusive right to procure franchisees in North and South Dakota, Montana, Wyoming, and part of Nevada. (D–322.) This agreement required a minimum of 48 franchise sales within five years. On or about July 17, 1968, Nataco and Taco Time Western States (partnership of Ed and Gil Craig) entered into a similar area license agreement for Colorado, Arizona, and New Mexico. (D–324.) This agreement established a quota of 28 franchise sales within five years. In February of 1969 Taco Time Western States agreed to purchase an existing franchise in Idaho. (P–1133, 1145.) Prior to that time Craigs had apparently obtained licensing rights for the southern portion of Idaho. (P–1145.)

By late 1969, the Craigs were in default as to minimum franchise sales obligations under the two 1968 area license agreements. They were also in default on some of their payment obligations under the various agreements. In order to remedy these defaults and to achieve various other objectives, Nataco and Craig's Taco Industries, Inc. (now CFI) entered into an "area license agreement" on November 14, 1969, covering eight entire states and parts of Nevada and Idaho. (D–1.) This agreement superseded all prior agreements between the parties. Among other changes, it reduced the minimum franchise sales requirements. The 1969 agreement required CFI to remit Nataco's share of royalties (1¼% of gross receipts of each store) within fifteen days after they were due CFI, whether or not CFI had collected from the store operators.

Although Fraedrick (then president of Nataco) testified that CFI was in default by mid-1970 on its minimum sales quota, he was in error because the first quota deadline under the 1969 Agreement was June 30, 1971. It appears, however, that CFI was unable to comply with the royalty payment terms of the 1969 Agreement. For this and other reasons, the parties engaged in negotiations for revision of the 1969 Agreement, the ultimate result of which was the "Amended Area License Agreement" dated May 1, 1971. (D–2.) In addition to other changes, this agreement reduced CFI's franchise sales quotas and relaxed the royalty payment terms to permit CFI to pay TTI's share "forthwith" upon collection of any royalties by CFI from franchisees. (*Id.* ¶¶ 7, 11.)

Within a few months after the execution of the 1971 Agreement, a dispute arose as to the division of royalties between the parties. Although they were unable to resolve this dispute definitively, the parties continued to perform under the contract without serious disagreements. In July of 1975, TTI became alarmed about CFI's practice of opening new franchises without TTI's prior written approval. At that point TTI requested that CFI immediately comply with the requirement of prior approval and other terms of the 1971 Agreement. (D–39.) At about the same time a dispute arose between the parties as to the scope of the term "franchise fee" as used in the agreement. (D–41, 41A, 41B.)

These disputes ultimately resulted in the present litigation, which was precipitated by a letter dated April 9, 1976, from TTI's counsel to CFI demanding payment of some $40,000 within ten days. (D–51.) On April 30, 1976, CFI initiated an action for declaratory judgment in state court. After CFI filed an amended complaint in January of 1978, the action was removed to this court.

CFI's amended complaint included eleven "counts." Only seven of these claims were included in the Pretrial Order. At trial, TTI moved for dismissal of five of those seven claims after CFI rested its case on November 7, 1978. At that time the court granted, with CFI's consent, the motion to dismiss these five claims for lack of evidentiary support. Thus, only two claims of CFI remain to be adjudicated. First, it seeks a declaration as to its obligations to TTI under paragraph 12 of the 1971 Agreement, providing for initial franchise fees. Second, CFI seeks a declaration as to the percentage of royalties it is obligated to remit to TTI under paragraph 11 of the 1971 Agreement. In connection with this claim CFI seeks recovery of money paid to TTI under protest since mid-1971. The franchise fee claim of CFI is the obverse of one of the major breaches asserted by TTI as grounds for termination of the agreement. Accordingly, that claim will be discussed in conjunction with TTI's assertions of breach.

TTI, in its amended counterclaim, pleads two counts. First, it seeks a money judgment and termination of the 1971 Agreement on the grounds that CFI has breached that agreement in sixteen respects. Second, it seeks injunctive relief to enforce the trust relationship between itself and CFI. The pretrial order, however, makes no mention of the second count. With regard to the first count, the pretrial order sets forth the following breaches claimed to have been committed by CFI:

(1) Failure to pay TTI its share of initial franchise fees and to hold same in trust.

(2) Failure to pay TTI its share of royalties forthwith, to hold same in trust, to exert its best efforts to collect same from franchisees, and to honor TTI's right to collect same from franchisees.

(3) Failure to obtain TTI consent and approval prior to transfer or assignment of existing franchises.

(4) Failure to perform its obligations to its franchisees.

(5) Failure to obtain TTI consent and approval prior to opening new franchises.

(6) Failure to submit accurate information to TTI in support of requests for approval for transfer or assignment of existing franchises or opening of new franchises.

(7) Failure to submit periodic financial statements to TTI.

(8) Failure to exert its best efforts to establish new franchises, and to give training and operating assistance to franchisees.

(9) Failure to refrain from any misleading or inaccurate statements to franchisees.

(10) Failure to honor and protect the trademark "Taco Time," and to deal in good faith with TTI in regard thereto.

(11) Failure to cooperate with TTI in resisting an alleged challenge to the trademark "Taco Time" by Bowles Packaging.

On September 25, 1978, counsel for TTI advised the court that TTI would not pursue the breach numbered (9) above. The

claims numbered (3) and (4) above were not addressed during final argument or in TTI's second proposed findings of fact and conclusions of law. During final argument on November 24, 1978, TTI withdrew its allegations that CFI had failed to submit periodic financial statements (7) and that CFI had failed to give training and operating assistance to franchisees (8). For these reasons and because of the lack of evidentiary support therefor, TTI's claims numbered (3), (4), (7), and (9) in the pretrial order and its claim that CFI failed to exert its best efforts to train and assist franchisees [part of (8)] are dismissed with prejudice.

■ In addition to its claim for termination, TTI asserts in the pretrial order that it "seeks reformation" of the 1971 Agreement to conform to the intent of the parties as to the percentage of royalties to be paid to TTI. (pp. 4–5.) This claim was not included in TTI's amended counterclaim but was instead pleaded as an affirmative defense in TTI's answer. (Fifth Count, ¶ 3E.) Despite TTI's failure properly to plead a claim for reformation, the court is persuaded that such a claim has been briefed, tried, and argued by express consent of the parties. Accordingly, under Rule 15(b), Federal Rules of Civil Procedure, this claim will be treated as if it had been asserted in TTI's counterclaim.

## ROYALTY PERCENTAGE DUE TTI

Turning first to the issue as to the percentage of royalties due TTI under paragraph 11 of the 1971 Agreement (D–1), the court notes that CFI's second claim for declaratory relief (and money damages) and TTI's claim for reformation hinge on this issue. In addition, TTI relies on certain actions taken by CFI in connection with this issue as a grounds for termination of the agreement. Paragraph 11 provides in pertinent part:

It is understood that the franchise agreement with regard to franchised outlets will require the operator to pay as royalties as [sic] sum equal to three and one-half percent (3½%) of the monthly gross receipts from such outlets . . . .

Forthwith upon the receipt of any such royalties by CTI, it shall remit to Nataco a sum equal to 35.71428 per cent thereof.

The foregoing language differed from that used in paragraph 11 of the 1969 Agreement (D–1) in two respects. First, under the 1969 Agreement, TTI's share of royalties was 1¼% of the gross receipts. Second, that agreement required CFI to remit TTI's share within fifteen days after the date the royalties were due CFI, whether or not CFI had actually received such royalties.

The 35.71428% used in the 1971 Agreement represents the ratio between 1¼% and 3½%. Under the literal terms of the 1971 Agreement, TTI was entitled to 35.71428% of whatever royalties CFI collected, except where royalties exceeded 3½%. If the royalty paid by any franchisee exceeded that rate, CFI was to receive two-thirds and TTI one-third of the excess. The difficulty lies in the fact that of the twelve stores established by CFI prior to May, 1971, ten were paying royalties of less than 3½%. (D–138, 321, at 24.) Under the 1969 Agreement TTI had been receiving 1¼% of the gross receipts of all twelve of those stores. Literal application of the percentage formula stated in the 1971 Agreement would have resulted in a reduction of TTI's share from the ten stores paying royalties of less than 3½%.

The evidence is clear that the parties engaged in considerable negotiation as to the provision in the 1971 Agreement allowing CFI to pay TTI's share "forthwith" upon receipt of the royalties by CFI. (D–6, 6A, 6B [¶ 11], 7B.) The evidence is equally clear that the parties did not negotiate any reduction of the percentage of royalties due TTI. (D–6A, 6B [¶ 11], 7A, 7B, 9, 10, 12, 14.) Of particular significance is the following statement of James Herschner, counsel for TTI, in a letter to Pete Vlahos, counsel for CFI:

Unless you can advise me that one or more of the officers of CTI will state that the negotiations with Taco Time's officers included a reduction of monthly royalties, it is my intent to forward this

matter to an attorney in your area to commence litigation within ten days.

(D–12.) After receiving the letter containing the foregoing statement, Vlahos met with Ed and Gil Craig and Dorothy Littrell (CFI controller and auditor) to discuss the matter. On November 9, Vlahos wrote to Herschner explaining CFI's views on the royalty dispute. (D–13.) This letter makes no mention of any negotiations bearing on a reduction of royalties to TTI. The court is persuaded that no negotiations on that point took place prior to the 1971 Agreement.

The evidence is clear and convincing that the parties did not intend paragraph 11 of the 1971 Agreement to modify the percentage of royalties to which TTI was entitled. Instead, Herschner drafted the new language to accommodate CFI's desire to remit TTI's share of royalties when collected by CFI and to provide a method of allocating partial royalty collections between the parties. (D–9 at 2–3.) Herschner and Vlahos both stated that they had overlooked the fact that most of the CFI outlets were paying less than 3½% royalties. (D–10, 12.)

Persuasive evidence of the intent of the parties is provided by their conduct after execution of the 1971 Agreement. CFI continued to pay royalties to TTI at the rate of 1¼% for several months after the 1971 Agreement was signed. (P–76, 1127.) Although there is evidence that CFI may have mistakenly remitted royalties to TTI on a one-third/two-thirds basis for a short time after the 1971 Agreement was signed, the evidence is persuasive that payments were generally made at the 1¼% rate until September 27, 1971. At that time Dorothy Littrell sent to TTI amended royalty statements for May, June, and July, indicating CFI's claim that it had overpaid TTI for those months. (P–76.) Littrell testified that she was originally told that the royalty payments were not affected by the 1971 Agreement and that she was the first person to discover that the 35.7% clause appeared to reduce TTI's share of royalties. She testified that when she explained her discovery to Ed and Gil Craig, they were surprised. Although the evidence on this point is conflicting, the court is persuaded that Littrell's testimony is credible and that CFI did not intend the 1971 Agreement to modify TTI's share of royalties.

During October and November of 1971, the parties and their counsel corresponded in an effort to resolve the dispute. In December, 1971, Ed Craig wrote a letter to TTI enclosing payment of the disputed amounts and indicating that such payment was made to avoid legal action and to further settlement discussions. (D–17.) The letter stated that CFI would continue to pay at the 1¼% rate "until we believe no further adjustment can be made between us or we have arrived at a mutually acceptable agreement." Apparently, no further discussion of this dispute took place for six years, after which CFI filed an amended complaint seeking recovery of amounts claimed to have been overpaid.

■■ In view of all the circumstances, the court is persuaded that TTI has demonstrated by clear and convincing evidence that paragraph 11 of the 1971 Agreement does not reflect the intent of the parties. Their intent was to modify the timing of royalty payments but to leave the allocation of such payments between themselves unchanged. Herschner drafted the agreement for TTI without being aware of the fact that ten of the twelve CFI stores then in existence were paying royalties of less than 3½%. The parties carelessly signed the agreement without realizing the effect of the language drafted by Herschner. In short, the written agreement did not reflect the antecedent agreement of the parties.

The parties are in agreement that the law of Oregon governs their rights and duties under the agreement by virtue of paragraph 24. Oregon law, consistent with general common law principles, permits reformation of a written instrument to conform to the antecedent agreement of the parties, as evidenced by their intent at the time the instrument was executed. *E.g., Interior Elevator Co. v. Limmeroth*, 278 Or. 589, 565 P.2d 1074 (1977); *Ray v. Ricketts*, 235 Or. 243, 383 P.2d 52 (1963). *See generally*, 66

Am.Jur.2d, Reformation of Instruments § 21 (1973). Paragraph 11 of the 1971 Agreement is therefore reformed to require CFI to remit royalties to TTI at the rate of 1¼% of gross receipts of franchises paying royalties of less than 3½%. The parties have not sought a declaration as to the appropriate allocation of partial royalty collections from stores paying royalties of less than 3½%, and the court expresses no opinion on that point.

TTI is accordingly entitled to an accounting and judgment for the amount of royalties withheld by CFI under CFI's claim that it was required to pay only 35.71428% on stores paying less that 3½%. The parties are directed to submit a proposed form of judgment setting forth the amount to which TTI is entitled under this claim, including appropriate interest.

TTI apparently does not contend that the mere assertion by CFI of its position as to the royalty percentage dispute constitutes a breach justifying termination of the agreement. TTI does contend, however, that CFI's failure to make royalty payments following CFI's decision to assert this claim constitutes a default justifying termination. This issue will be discussed in conjunction with TTI's general claim that CFI has failed to pay TTI's share of royalties forthwith.

## FAILURE TO PAY ROYALTIES FORTHWITH

TTI asserts that CFI's failure to pay royalties forthwith is the "most inescapable" breach by CFI of the 1971 Agreement. Paragraph 11 of that agreement provides in pertinent part:

Forthwith upon the receipt of any such royalties by CTI, it shall remit to Nataco a sum equal to 35.71428% thereof.

In contrast, the 1969 Agreement had required CFI to remit TTI's share of royalties within fifteen days after they were due CFI from the franchisees, whether or not CFI received such payments. (D–1, ¶ 11.) CFI failed to comply with that provision of the 1969 Agreement. (D–6.) Despite this and other defaults, TTI refrained from termi-

nating the agreement. Instead, the parties communicated in an effort to negotiate a new agreement. During those negotiations, both sides suggested that CFI should remit TTI's share of royalties within a ten-day period from the time CFI received payment from the franchisee. (D–6B, ¶ 11; D–7B, at 4.) The final agreement, however, substituted "forthwith" in place of a fixed period.

During the period from mid-1971 through 1975, royalty payments were generally made to TTI within 20 to 60 days following the month in which CFI received royalties from franchisees. (P–1102.) During that period, payment was made on nine occasions within less than 20 days and on seven occasions beyond 60 days. (*Id.*)

Nearly all of these payments were accepted by TTI without threat of termination. No letters demanding payment under threat of termination were sent during this four-year period. (P–1102.) A ten-day letter dated November 22, 1971 (D–15) was issued concerning the royalty percentage dispute, but it did not mention timeliness of payments. Exhibit P–1102 indicates that a ten-day letter was issued in January of 1975, but the letter was not adduced at trial. That date, however, coincides with periods of 80 and 74 days from collection to remittance.

In short, it appears that from 1971 through mid-1975, TTI acquiesced in CFI's general pattern of paying royalties within 20 to 60 days after the month of collection and issued a ten-day letter only when payment was protracted for 70 to 80 days for several consecutive months. TTI's general acquiescence in CFI's pattern of royalty payments is probative of the appropriate construction of the term "forthwith." The court is thus persuaded that paragraph 11 of the 1971 Agreement imposed an obligation on CFI to remit TTI's share of royalties within 20 to 60 days after the month in which royalties were received by CFI.

Under this construction, CFI failed to make timely payments on about 15 occasions from 1971 through 1977. (P–1102.)

Under the termination provision of the 1971 Agreement, (D–2, ¶ 8) a default is not "considered to have occurred" until TTI provides CFI a written notice specifying the default and granting CFI ten days in which to remedy the default. Such notices were given on some eight occasions prior to 1978 (with regard to timely payment of royalties). (P–1102.) On each of those occasions, CFI either brought its royalty payments current within the ten-day period or TTI waived CFI's failure to do so. TTI thus relies primarily on CFI's failure to pay royalties in December, 1977 and thereafter. An agreement was reached between counsel for the parties on or about December 1, 1977, under which CFI was to remit royalties collected during October by December 1, and was thereafter to remit royalty payments by the 22nd of the month following the month of collection. (D–109.) Contrary to the assertion of TTI's counsel, CFI met the December 1 payment deadline as agreed. (D–195.)

During the months of December and January, however, this lawsuit escalated substantially as a result of TTI's December 7 motion for leave to file an amended counterclaim alleging numerous breaches not theretofore raised. The only breach previously asserted by TTI was the claim that CFI was withholding part of TTI's share of initial franchise fees. On December 23, CFI filed a motion to amend its complaint to assert numerous additional claims against CFI. One of these claims sought recovery of excess royalty payments to TTI under the theory that paragraph 11 of the agreement should be literally applied.

In an attempt to sequester funds for the satisfaction of an anticipated favorable judgment, counsel for CFI began paying TTI's share of royalties into state court in December, 1977. After removal of the action to federal court, CFI paid the royalties into court until the court, on June 6, 1978, entered an order denying CFI's April 6 motion for leave to deposit funds into court. After that order, CFI tendered payment to CFI in July and August in amounts computed according to CFI's version of paragraph 11. TTI rejected these tenders. On August 21, CFI tendered payment in multiple checks. TTI accepted this tender except for the portion representing royalties from stores paying less than 3½%. (*Id.*; D–195.) The court is not advised as to the status of payments after August of 1978.

In claiming that CFI's failure to make timely royalty payments is the "most inescapable" breach, TTI relies primarily upon the fact that CFI paid royalties into court for about six months without leave of court. The court held in its order of June 6, 1978, that Rule 67, Federal Rules of Civil Procedure, did not permit CFI to pay the royalties into court. Although such payment might have been permissible under Rule 64, CFI made no attempt to secure authorization of payment thereunder.

TTI's contention that CFI flagrantly breached the contract by paying royalties into court is undermined by three significant factors. First, TTI's motion to amend its counterclaim to allege a large number of breaches not previously asserted precipitated CFI's motion to amend its complaint and, in conjunction therewith, its decision to attempt a sequestration of funds in aid of one of its newly asserted claims. Second, CFI's act of paying royalties into court was not necessarily impermissible, but was evidently a result of the ill-advised reliance of counsel on Rule 67 rather than Rule 64. The court ruled only that such payments were not permissible under Rule 67. Third, and most significant, despite the fact that CFI began paying the funds into court some nine months before trial, TTI did not at any time file a motion for release of the funds CFI had paid into court. In view of this fact the court is not persuaded that the collection of royalty payments is a matter of genuine urgency to TTI. Instead, TTI has acquiesced in the court's role as a stakeholder in this dispute. As a further consideration, the court notes that payment of the funds into court did not impose a risk of non-collection on TTI.

■ Under the circumstances present in this case, the court is persuaded that CFI has not materially breached the provision

requiring it to remit royalties to TTI forth-with upon collection. CFI has complied with all ten-day letters issued by TTI concerning timely payments except in some seven instances. In those cases the funds were paid into court on the advice of counsel. In light of all the circumstances of this case, CFI's payment of royalties into court is a trivial and technical default that does not warrant the extreme remedy of termination of the agreement. It would be grossly inequitable to declare a forfeiture of CFI's rights and interests in the 1971 Agreement on the basis of such an insignificant default.

## FAILURE TO HOLD ROYALTIES IN TRUST

█ TTI asserts that CFI has further breached paragraph 11 of the 1971 Agreement by failing to hold TTI's share of royalties in trust. Paragraph 11 provides in pertinent part:

Nataco's share of each royalty shall be deemed held in trust for Nataco by CTI until the same is paid over to Nataco.

In contrast, paragraph 12 of the agreement provides that whenever CFI collects TTI's share of initial franchise fees, CFI "shall hold the same in trust" for TTI. The phrase "deemed held in trust" does not necessarily create a trust relationship between the parties. It does not unambiguously require funds to be segregated or given other special treatment by CFI. The phrase "deemed held in trust" may be construed as nothing more than an indication of mutual intent to establish a preference or priority in favor of TTI over other creditors of CFI.

The record contains no testimony as to the parties' intended meaning of the phrase. The correspondence evidencing negotiations between the parties prior to the 1971 Agreement contains no mention of a requirement that royalties be held in trust for TTI. Ed Craig testified that he could recall no mention of the trust language during the negotiations and that TTI made no mention of the trust provision at all until after this suit had been filed. Ron Fraedrick testified that he never requested that

CFI hold the funds in trust. No written ten-day notice of default of the claimed trust relationship was offered as evidence. The evidence shows only that CFI did not maintain a separate account for TTI's share of royalties and that CFI may have employed funds owed to TTI to pay other creditors.

TTI has failed to demonstrate that paragraph 11 of the agreement imposes any fiduciary duties on CFI. Even if it is assumed that CFI has such duties, TTI has plainly failed to establish what those duties are. The allegation that CFI failed to hold royalties in trust appears to have been an afterthought and a makeweight. Under the circumstances of this case, TTI has failed to show a material breach of the contract. Moreover, TTI has failed to establish that it provided the written notice of default that is a condition precedent to termination under paragraph 8 of the agreement. Even if such notice had been given, a technical default of the type claimed by TTI would not justify termination of the agreement in view of compelling equitable considerations to the contrary.

## FAILURE TO EXERT BEST EFFORTS TO COLLECT ROYALTIES

█ Paragraph 11 of the 1971 Agreement further provides that:

CTI shall use its best efforts to collect royalties and shall advise Nataco of all collection activities undertaken by CTI.

Paragraph 10 of the standard form franchise agreement (part of D–2) requires the payment of an "operating charge" of 3½% of gross receipts and further provides:

The Operator shall furnish to CTI not later than the 10th day of each calendar month a detailed profit and loss statement prepared upon forms approved or furnished by CTI, and shall at the time of the giving of such profit and loss statement pay to CTI the percentage mentioned above.

Both Fraedrick and Ed Craig testified that this ambiguous provision requires franchisees, by the tenth of each month, to pay

CFI 3½% of their gross receipts for the preceding month.

The evidence fails to establish any definite standard of best efforts by which CFI's collection procedures can be measured. The evidence does show, however, that several of TTI's own stores were sometimes six to eight months late in paying royalties and that as of July, 1978, none of TTI's "newer franchisees" were paying royalties. (P–468, 529, 1058.) Two stores in Washington (not in CFI area) failed to pay royalties for about twelve months. (P–1054.) The evidence also shows that many franchisees in CFI's area were frequently behind in paying royalties and that some of them were about six months behind in 1977. (D–86, 147, 196.)

CFI presented evidence explaining that franchisees often had serious financial difficulties during a large part of the year due to low sales volume, weak market, poor cash flow, and general economic conditions. For these reasons, collection of delinquent royalties from franchisees was a difficult dilemma for CFI. It was often forced to choose between terminating a franchisee for nonpayment and incurring TTI's displeasure by postponing legal action in the hope that delinquent franchisees would bring their payments current. Obviously, the former choice was often counterproductive for all concerned.

In view of the circumstances of this case, the court is persuaded that TTI has failed to meet its burden of establishing that CFI failed to comply with the contract provision requiring CFI to use its best efforts to collect royalties from franchisees.

## FAILURE TO HONOR TTI'S RIGHT TO COLLECT ROYALTIES

Paragraph 11 of the 1971 Agreement provides in part:

> Nataco shall have the right but not the obligation to proceed directly against any franchised operator for the collection of royalties . . .. Nataco shall not make any such collection activity without first giving CTI ten (10) days' written notice of Nataco's intent to do so.

In August of 1977, TTI gave CFI notice of its intent to collect royalties directly from some 47 franchisees. (D–90.) In response, CFI filed a motion for a temporary restraining order and preliminary injunction to prevent direct collection by TTI. (P–147; state court file.) The state court granted the motion for temporary restraining order on August 26, and TTI thereafter abandoned its intention to collect royalties directly. TTI asserts that CFI breached the contract by seeking and obtaining the temporary restraining order.

In support of its motion for a temporary restraining order, CFI argued that a condition precedent to TTI's exercise of its contractual right to collect directly is that CFI must have failed to exert its best efforts to collect the royalties. CFI further argued that it had used its best efforts to collect the royalties and that it had much more at stake than TTI because many franchisees owed CFI substantial sums for building leases, land leases, furniture and equipment leases, advertising, merchandise, and various services. CFI contended that its rights to collect these amounts would be jeopardized by direct collection efforts by TTI. (P–147.) The additional sums owing to CFI were typically a product of CFI's "turnkey" franchise program, by which CFI had achieved rapid expansion of the Taco Time operation during 1975 through 1977.

The court is persuaded that a failure of best efforts by CFI to collect royalties or other substantial justification is a condition precedent to the exercise of TTI's right to collect royalties directly from franchisees. One of the key aspects of the 1971 Agreement was that CFI would collect royalties and remit TTI's share. The parties did not contemplate that paragraph 11 would permit TTI to usurp this function arbitrarily. Moreover, the implied contractual obligation of good faith imposes on TTI a duty, absent good cause, to refrain from action that could jeopardize CFI's right to recover substantial additional debts of franchisees to CFI. TTI has failed to demonstrate that CFI was not employing its best efforts to

collect or that TTI had other good cause for attempting to collect directly. Thus, it has failed to establish a breach by CFI of the direct collection provision.

 Even more importantly, the court concludes that TTI's claim of breach in this regard should not be countenanced because TTI in essence seeks to enlist the court's aid in punishing CFI for presenting a colorable claim of right to a court of law. TTI's claim is particularly repugnant to basic principles of justice in view of the fact that the state court granted the temporary restraining order sought by CFI.

### FAILURE TO PAY TTI'S SHARE OF FRANCHISE FEES

The point of disagreement that inspired this lawsuit is TTI's claim that CFI failed to pay TTI's full share of initial franchise fees. TTI seeks a declaration that it is entitled to 10% of an undetermined amount that CFI has collected from franchisees for various goods and services. CFI contends that it has paid TTI its 10% of franchise fees and that it is not obligated to pay TTI 10% of amounts CFI has charged for goods and services in addition to those CFI is obligated to provide under the 1971 Agreement.

With respect to franchise fees, paragraph 12 of the agreement provides:

> Ten per cent (10%) of any initial franchise fee *or* Five Hundred Dollars ($500), whichever is greater, shall be paid by CTI to Nataco. CTI shall charge an initial franchise fee of not less than Five Thousand Dollars ($5,000) nor more than Ten Thousand Dollars ($10,000) without the prior written consent of Nataco.

The latter sentence simply requires and authorizes CFI to charge a franchise fee of five to ten thousand dollars "without the prior written consent" of TTI. Although the parties seem to agree that TTI's consent must be obtained before CFI can charge more than $10,000, the literal terms of paragraph 12 contain no such requirement. The agreement is even more seriously deficient in that it altogether fails to define "initial franchise fee."

Against this backdrop of ambiguity and careless draftsmanship, the court turns to the morass of confusion generated by the parties' conduct regarding franchise fees in the course of their relationship. The pre-1969 agreements between TTI and the predecessors of CFI included significantly different provisions relating to initial franchise fees. The 1965 agreements for the Spokane store and the Utah area made no provision for an initial franchise fee. (D–323; P–1132.) The 1968 agreement for Montana, Wyoming, North and South Dakota, and part of Nevada provided that Nataco would receive one-third of the franchise fee. (D–322, ¶4.) The 1968 agreement for Colorado, New Mexico, and Arizona provided for a payment to Nataco of $1,000 for each franchise sold. (D–324.) The Gibbs agreement for southern Idaho (P–1133), assumed by the Craigs in 1969, required a $3,000 franchise fee to be paid Nataco for each store. Correspondence from Fraedrick in 1968 and 1969 indicates that the franchise fee was distinct from equipment costs. (P–1089, 1122.)

The 1969 Agreement, (D–1) provided for an initial franchise fee of $4,500, of which $3,000 was to be paid to Nataco. It apparently did not impose on CFI any duties of training and assisting franchisees. (P–1131.) No stores were opened under the 1969 Agreement.

In early 1970 CFI corresponded with TTI about CFI's proposed "Turn Key Success Package." (D–4.) CFI estimated that this package would require a total investment of $32,000, of which $10,000 was designated as "total franchise costs." The $10,000 fee was to include opening inventory, opening and other assistance, prepaid royalties, advertising, promotional material, site analysis and selection, and training. Equipment costs were listed as a separate expense. (*Id.*) At no time did TTI claim that it would be entitled to two-thirds of the entire $10,000 package or any of the equipment costs. At about the same time TTI offered a similar package with a total cost of $23,-000, of which $3,000 was designated a fran-

chise fee. (P–1130.) The brochure describing this package listed site analysis and location fee, equipment, inventory, and lease deposits as costs distinct from the franchise fee.

In early 1971 CFI offered a turnkey package located in St. George, Utah for $18,500. (P–1135.) Although the $18,500 was not fully itemized, the description listed several items, including equipment, inventory ($1,000), and lease deposits ($500) and further stated that one Taco Time franchise was part of the total cost. This package was purchased by Lew Hains for $18,500. (P–1136.) The St. George store was opened pursuant to the terms of the 1971 Agreement, which became effective May 1, 1971. That agreement shifted training and opening assistance responsibilities to CFI and entitled TTI to 10% of an initial franchise fee of $5,000 to $10,000. CFI remitted $500 to TTI as full payment of the franchise fee for the St. George store. (P–1137.) TTI accepted this sum as full payment of the franchise fee with knowledge that the St. George package had been sold for $18,500. TTI did not at any time claim that it was entitled to more than $500 for that store. The turnkey franchise sales technique was apparently not employed by CFI in the opening of further stores until 1975.

By late 1972, both TTI and CFI were charging an initial franchise fee of $10,000. (P–1067, 1068.) In January of 1973, both companies increased the franchise fee to $12,500. (P–1068, D–20.) During 1973, TTI's conception of the initial franchise fee did not encompass additional charges for real estate lease deposits and insurance, equipment lease deposits, opening advertising and inventory, and other services. (P–1083, 909.) Similarly, CFI viewed the $12,500 franchise fee as distinct from lease deposits, inventory, advertising, and other costs of establishing a store. (P–35.) During 1973 and 1974 there was some communication between the parties about increasing the franchise fee to $15,000 or more (D–21, 22), but no agreement was reached on that point.

In January and in March of 1975, CFI prepared descriptions of its "Modular Taco Time Success Package" and submitted copies thereof to TTI. (P–61, 62.) These descriptions delineated the $12,500 franchise fee as a cost separate from lease deposits, site analysis and preparation, advertising, extensive training (beyond the minimum training required by TTI), accounting set-up, uniforms, opening cash, opening week assistance, and miscellaneous "turnkey start-up costs." TTI responded favorably to the turnkey program in January and April of 1975. (P–1115, 1116.)

In July of 1975, CFI forwarded nine franchise agreements to TTI for approval with a check for $11,250, representing 10% of a $12,500 franchise fee for each store. In those agreements, Gil Craig's secretary had "mistakenly" inserted the total turnkey package cost in the blank provided for the franchise fee. On July 21, 1975, Fraedrick wrote a letter to CFI claiming that TTI was entitled to 10% of the entire turnkey charge. (D–41.) Ed Craig testified that this claim came as a "total shock" to him, as it was the first time TTI had claimed a right to 10% of the additional turnkey charges.

On August 12, 1975, TTI's attorney, James Herschner, wrote to CFI's counsel expressing his opinion that TTI was entitled to $23,600 (10% of the full turnkey amount). (D–41A.) In the next paragraph, however, Herschner stated that in his opinion, TTI:

> is entitled to 10% of any original fee or charge made to a franchisee unless the charge represents actual expenditures by CTI to third persons for tangible items such as physical sight [sic] improvements, uniforms for initial personnel at the franchised outlet and opening cash. Should CTI make any profit in any of these items, it is my opinion that TTI is entitled to 10% of such profit.

For a time TTI refused to approve the nine franchise agreements until it received payment for 10% of the entire turnkey package price. The parties reached a stipulation in September, 1975, under which TTI agreed to approve the franchise agreements with

full reservation of its claim to the additional sums. (D–41A, 41B.)

On April 9, 1976, Mr. Neill (trial counsel for TTI and associate of Herschner) sent a letter to CFI demanding, among other things, payment of $18,360 claimed by TTI as its share of initial franchise fees within ten days. (D–51.) On April 30, CFI responded by filing this action for a declaration as to its obligations regarding the franchise fees. TTI counterclaimed for a declaration of its rights regarding franchise fees and for termination of the agreement. The itemization of the $18,360 demanded by Neill indicated that TTI claimed the initial franchise fee to be $22,700 for each of eighteen stores. (D–51.) This amount was apparently arrived at by adding all goods and services listed in CFI's turnkey sales brochures (P–61, 62) except opening cash ($300), lease deposits ($5,000), and site preparation ($0 to $2,000). The $22,700 thus included such items as site analysis, "turnkey start-up costs—all expenses and expertise," pre-opening advertising, personnel training, accounting set-up, initial uniforms, and opening week assistance. (P–61, 62.) On May 6, 1976, Fraedrick met with Ed Craig to discuss their differences. Fraedrick indicated TTI's position to be that it was entitled to "the full 10%" of the fees charged by CFI. (D–53.)

In his deposition, Fraedrick stated that the franchise fee did not include lease deposits, proceeds from the sale of equipment and food, some construction costs, and many other things. On the other hand, he stated that compensation for CFI's role as a lease guarantor would be part of the franchise fee, as would charges for site analysis and preparation. When asked whether fees for accounting set-up, site analysis and preparation, site plans, advertising, etc. were included in the definition of franchise fee, he responded that he "would have to look at each item specifically and make a determination as to what it was for, how it was done, and so forth." These statements were made by Fraedrick two months prior to trial. Thus, three years after the franchise fee dispute developed and over two years after the litigation began, Fraedrick was unable to make any clear delineation between charges included in the franchise fee and those not so included. Moreover, he was unable to articulate any rational philosophy as to what charges should be included in the franchise fee.

At trial TTI reverted to the position that it was entitled to 10% of CFI's entire turnkey charge. (D–194.) Yet Fraedrick testified at trial that he did not expect CFI to pay 10% on lease deposits and similar charges in the turnkey package. Counsel for TTI contends that CFI somehow has the burden of establishing what charges should not be included as part of the franchise fee. TTI has totally failed to develop any logical theory for resolving the inconsistent positions it has taken on the franchise fee issue. Fraedrick testified that the 1971 Agreement reduced TTI's share of the franchise fee from two-thirds of $4,500 to 10% of $5,000 to $10,000 to accommodate CFI's turnkey program. This testimony is hardly credible in view of the fact that the St. George turnkey package, the first franchise opened under the 1971 Agreement, was sold for $18,500, yet TTI claimed no more than $500 as its share of the franchise fee.

■ The court is persuaded that CFI, in taking the position that TTI is not entitled to 10% of turnkey fees, has not committed a breach of the 1971 Agreement. The agreement fails to define franchise fees. The parties have repeatedly described the franchise fee as an item distinct from charges for numerous goods and services required to establish a Taco Time store. (*E.g.*, P–1135; 1083, 909, 61, 62, 1025, 1086, 64.) Of particular significance is TTI's unqualified acceptance of $500 as full payment for its share of the St. George franchise fee in June, 1971. In view of these circumstances, CFI had ample justification for taking the position that the initial franchise fee constituted $12,500 of a turnkey package costing $20,000 to $30,000. TTI asserts that it is entitled to terminate the 1971 Agreement because CFI refused to pay TTI whatever it chose to demand under paragraph 12 of the agreement, notwithstanding this uncertain

support, and because CFI refused to abandon a colorable claim as to the interpretation of the agreement. The court is unable to comprehend TTI's position that the drastic remedy of termination is merited punishment for CFI's claim, particularly where, as here, the agreement fails to establish with any certainty what performance is required with respect to the disputed matter.

The court thus concludes that CFI has not committed a breach of the contract by refusing, under a colorable claim, to pay TTI 10% of turnkey fees. TTI is plainly not entitled to terminate the agreement on the basis of the franchise fee dispute. The more difficult question, however, remains to be decided: What was the parties' intended meaning of "franchise fee" as used in the 1971 Agreement.

The best evidence for this determination is the agreement itself and the subsidiary franchise and license agreements. The first paragraph (1) of the "Franchise Agreement" used by the parties in granting individual franchises is a clause granting the franchisee the exclusive right to use the Taco Time trademark, methods, recipes, logo, etc. at a specific address within a protected area. (See Ex. A attached to D–2.) The second paragraph provides for a definite sum as the "consideration of the grant of this right," and further describes this sum as "the franchise fee." The agreement requires the franchisee to erect a restaurant and provides that CFI has no obligation to select a location, obtain a lease, or otherwise acquire premises for the franchisee. (Id. ¶ 4.) CFI is obligated to provide a (variable) number of days of training for the franchisee and one employee without charge. (Id. ¶ 6.) CFI is required to provide "opening assistance" to the franchisee. (Id. ¶ 7.) The agreement does not require CFI to provide uniforms, opening cash, lease deposits, inventory items, advertising, accounting systems, site analysis, site preparation, or any other turnkey goods or services.

The license agreement (attached to D–2) used for CFI-operated stores provides for an "initial franchise fee" of $500 to TTI. (Id. ¶ 30.) The first paragraph of that agreement grants CFI the exclusive right to employ the Taco Time trademark, recipes, systems, etc. at a specific address within a protected area. The license agreement further provides that TTI is not required to perform the same services to CFI that TTI provides for ordinary franchised outlets in other areas. (Id. ¶ 2.) The agreement requires CFI to provide its own training (Id. ¶ 7) and imposes on TTI no obligation to provide opening assistance or other services to CFI. The only value conferred by TTI under this agreement is the trademark and other intangible rights.

█ Similarly, the only value conferred on franchisees *by TTI* under the standard franchise agreement is the trademark and other intangible rights. Ninety percent of the initial franchise fee was retained by CFI as compensation for the promotional effort and expense of procuring franchisees and for the additional services of training and opening assistance that CFI was required to perform under the franchise agreement. The parties did not intend the franchise fee to include compensation for any other goods or services provided by CFI. Thus, TTI is not entitled to 10% of any sums paid to CFI for lease deposits, opening cash, uniforms, site analysis, selection, and preparation, equipment deposits, business licenses, down payments on buildings, accounting set-up, advertising, insurance, employee salaries, opening inventory, and similar goods and services. Neither is TTI entitled to 10% of charges for training beyond the minimum training required under the franchise agreement or for opening week assistance beyond that required by the franchise agreement.

█ TTI has failed to meet its burden of proving that, as its share of initial franchise fees, it is entitled to any sum in addition to the amount CFI has already remitted. (*Cf.*, P–1143.)[1] TTI asserts (intermittently) a patently unreasonable claim to

---

1. At trial the court reserved ruling on the admissibility of P -1141, 1143, 1146. The court is persuaded that these exhibits should be received, and rules accordingly.

10% of all turnkey services and contends that CFI should bear the burden of establishing which turnkey charges should not be included as part of the initial franchise fee. On the contrary, the burden properly rests on TTI, and TTI has failed to meet that burden. Accordingly, the court concludes that CFI has fully complied with paragraph 12 of the agreement with regard to the division of initial franchise fees between the parties.

## FAILURE TO HOLD TTI'S SHARE OF FRANCHISE FEES IN TRUST

■ TTI claims that CFI has breached paragraph 12 of the agreement by failing to hold TTI's share of franchise fees in trust. Paragraph 12 provides in pertinent part:

Whenever Nataco's share of such initial franchise fee shall be paid to or come into the possession of CTI, CTI shall hold the same in trust for Nataco and shall remit the same forthwith to Nataco.

This language differs from that used in paragraph 11 with regard to royalties ("deemed held in trust"). In all other respects, the proper analysis of this claim parallels that of TTI's claim that CFI failed to hold royalties in trust. There is no evidence as to the parties' intent in using this language. TTI never mentioned this language or demanded compliance with it prior to the motion to amend its counterclaim in December, 1977. At that point the claim was apparently an afterthought and a makeweight. TTI has failed to establish what duties the trust language imposed on CFI.

The court finds and concludes that TTI has failed to establish a material breach of the agreement in this regard. TTI has also failed to establish that it provided CFI the notice of default that is a condition precedent to termination of the agreement. Finally, even if such notice had been given, the technical and trivial nature of the claimed default would not justify termination of the agreement under applicable law.

## FAILURE TO OBTAIN APPROVAL PRIOR TO FRANCHISE OPENINGS

TTI claims that CFI has breached the 1971 Agreement by failing to obtain TTI's approval prior to the opening of new franchises. Paragraph 2 of the agreement provides in pertinent part:

The operator of each franchised outlet must execute three (3) copies of a franchise agreement with CTI, which will hereinafter be referred to as the franchise agreement. The franchise agreement must be approved thereon in writing by Nataco. No party thereto shall have any rights or obligation thereunder until the franchise agreement is executed by all parties and so approved by Nataco.

In addition, paragraph 4 provides:

Prior to the execution of any franchise or license agreement, CTI must submit to Nataco such information as it may request with regard to the contemplated outlet, including but not limited to financial statements of the proposed operator, architectural plans, drawings, and specifications for the proposed outlet, the location of the proposed outlet, and such studies or data that are reasonably required to provide background information with regard to the characteristics of the location of the proposed outlet, the lease or proposed lease covering the location for the proposed outlet, and such other information as Nataco may request. . . .

No franchised or licensed outlet shall be opened for business prior to the full execution and approval by Nataco of a franchise or license agreement covering such outlet.

These provisions clearly require the written execution of a franchise agreement by TTI, CFI, and the franchisee prior to the opening of a Taco Time franchised store in the CFI area. In practice, however, these formalities were frequently disregarded by TTI and CFI. One of the first stores opened under authority of the 1971 Agreement, the St. George store, was opened in May, 1971. (P–20.) The franchise agreement, dated May 1, 1971, was signed by Ed Craig (for CFI) and by the franchisee. Al-

though the date August 15, 1971, was entered as the approval date on the agreement, the agreement was never executed by TTI.

The practice of opening stores without regard to the formalities required under the agreement continued through 1973 and 1974. The Fairview store in Boise, Idaho opened in July, 1973 (D–138; P–20), yet no franchise agreement for that store had been signed as of January, 1974. (P–755.) There is doubt as to whether a franchise agreement for the Fairview store had been fully executed as of the time of trial. (P–1108.) On December 2, 1974, Dennis Senger of TTI wrote to CFI at Fraedrick's request, indicating that TTI had no franchise agreements for stores located in Twin Falls, Cedar City, Helena, and Idaho Falls. (P–855.) The Twin Falls store had opened in September or October of 1973. (P–20; D–138.) The Cedar City store opened in October, 1973. (Id.) The Helena store opened in March, 1974 and closed its doors in 1975. (P–20.) It appears that no franchise agreement for that store was ever executed. (P–1108.) The Idaho Falls store had been opened in May, 1974. (P–20; D–138.) Thus, stores were frequently open for over a year without a fully executed franchise agreement in force.

The testimony clearly shows that prior to July, 1975, CFI frequently opened stores without the written approval of TTI. Moreover, Fraedrick frequently signed franchise agreements that were partially blank, giving CFI full discretion to select the franchisee or the location of the store. During that period TTI seldom, if ever, requested detailed information from CFI regarding new franchises, yet all franchises were readily approved.

In early 1975 CFI launched an aggressive franchise sales campaign employing the newly developed modular turnkey package described in Exhibits P–61 and 62. On April 1, 1975, CFI issued a newsletter stating, among other things, that:

We are currently franchising our modular unit. During the first three months of 1975 we sold eight franchises and expect to sell at least two additional franchises each month for the next nine months.

(P–1114 at 2.) A copy of this newsletter was sent to TTI, and Fraedrick responded by letter on April 24. (P–1116.) He congratulated CFI for its sales efforts, commenting that CFI was "really on the move." He further stated that:

I would certainly like a look at your modular building—pictures, plans, etc.

. . .

I am also interested in where you are expanding your operations, where new franchises will be opened, and a time table for them.

(Id.) Fraedrick's response to CFI's announcement that it had sold eight franchises contains no hint of anxiety as to the possibility of a store opening without TTI's approval, no expression of a desire to direct or control the location of stores or the qualifications of franchisees, and no indication of concern as to the judgment used by CFI in selling franchises.

On June 30, 1975, Fraedrick again wrote to CFI concerning another matter, indicating that he would be in Utah the following week, and adding:

I hope you will have some time to spend with me while I am there looking at your new modular Taco Times. I have perused your plans very carefully and am anxious to see the unit operating. I am looking forward to seeing you next week.

(P–1117.) Although this letter demonstrates Fraedrick's knowledge that new franchises were open or ready to open, it reveals no concern about the lack of written approval thereof by TTI.

Fraedrick's easygoing attitude mysteriously evaporated by the time he arrived in Utah only a week later. He testified that he had heard several stores were open without his approval before he went to Utah. On July 8, he went to a newly opened modular store at 39th South and State Street in Salt Lake City and found Ed Craig there. He told Craig he was upset and demanded a meeting with him. Later that day Craig met with Fraedrick. At the

meeting Fraedrick requested "immediate compliance" by CFI with numerous provisions of the agreement. On July 11 Fraedrick wrote to Craig, reiterating his requests, which included payment of royalties twice monthly, submission of quarterly financial statements, TTI approval prior to store openings, the furnishing of detailed information regarding new franchises prior to approval, prompt payment of franchise fees to TTI, approval of advertising by TTI, and discontinuance of CFI's use of the Taco Time logo on its letterhead (which TTI had condoned for over five years). (P–1128; D–39.)

On July 15, CFI forwarded nine franchise agreements to TTI for approval. (D–44, 41.) Fraedrick wrote to CFI on July 21, 1975, requesting additional information and expressing for the first time TTI's claim that it was entitled to 10% of the entire turnkey package price. (D–41.) Fraedrick's letter evidences no concern as to the suitability of the new locations or franchisees. Instead, Fraedrick's real concern was to collect 10% of the entire turnkey package price:

> The Area License Agreement calls for TTI to receive 10% of the initial [franchise] fees. Your check represented less than 5% of the initial fees. Please forward the balance of $12,350 so I can approve these agreements.

On August 12, TTI's counsel wrote a letter to CFI's counsel, reiterating TTI's claim to 10% of the turnkey price and proposing that TTI approve the nine franchise agreements on the express condition that the parties would reserve the franchise fee question "for determination by a court of competent jurisdiction." (D–41A.) On September 5, CFI agreed to the proposed stipulation regarding franchise fees. (D–41B.) On September 15, Fraedrick approved most of the nine agreements, as well as several others subsequently submitted by CFI for approval. (P–906; D–31, 34, 35, 36, 37, 38.) TTI's delay in approving the agreements was a result of the franchise fee dispute. (D–45.) It was not a result of TTI's concern about the suitability of the new franchises.

TTI did not in fact require the detailed information demanded by Fraedrick in July prior to approving the franchise agreements ratified on September 15. (P–1108.) At least one of the agreements approved on that date even failed to specify the address or location of the store to be opened in Salt Lake City pursuant thereto. (P–906.) In early September, 1975, TTI appears to have had little concern about the fact that many franchises were open without TTI consent. TTI's newsletter dated September 1, 1975, described the new stores in Richfield and Brigham City, Utah with fatherly pride and observed that they had opened on July 15 and 25, respectively. The franchise agreements for these stores were not approved until September 15.

On November 26, 1975, Fraedrick wrote to CFI complaining that CFI had not complied with TTI's demands made July 8 and 11 for detailed information, approval prior to opening, prompt payment of royalties, etc. (D–43.) The letter further stated:

> On July 8, 1975 in our meeting, and in my letter of July 11, 1975 I indicated what Taco Time Int., Inc. would prefer as a means of clearing up these defaults. To date I have had no reply and these breaches continue. I, therefore, must inform you that should Taco Time Int., Inc. not receive satisfactory communication or complete compliance to the Amended Area License Agreement by December 15, 1975 we will proceed with the steps necessary to effect cancellation of this Agreement.

(D–43 at 3.)

Ed Craig responded with a letter dated December 12, 1975, in which he described the efforts CFI had made to comply with Fraedrick's demands, submitted franchise agreements for six new franchises, provided TTI with substantial additional information, forwarded royalty and franchise fee payments, and expressed CFI's intention to comply with TTI's demands. (D–44.) Craig added:

> Evidently there is a gross lack of understanding of the communications, i.

e., a dozen or more letters since our July 8 meeting between TTI, CTI, and our respective attorneys in an effort to massage the differences since our July 8 meeting. Hence, I do not understand your comment, "To date I have had no reply and these breaches continue."

(*Id.* at 3.) Fraedrick replied on December 16, 1975, with a letter expressing dissatisfaction with the fact that further stores were being opened prior to TTI's written approval of the franchise agreements. (D–45.) TTI approved franchise agreements for several such stores on December 16, 1975 (D–200), two of which did not specify the address or precise location of the new stores. (P–897, 898.)

On or about March 30, 1976, TTI forwarded to CFI approved franchise agreements for five stores that had been opened between February 18 and March 13, 1976. (D–50; P–200.) The court is unable to determine when these agreements were submitted to TTI. Fraedrick's letter accompanying these agreements stated:

> It is apparent from an examination of the execution dates on these agreements and additional information we have received that outlets are still being opened prior to our approval, despite our numerous past demands . . . . We have asked our attorneys to advise us as to our remedies for this and other breaches of the agreement committed by you, since we find ourselves totally frustrated by our past reliance on your assurances. We will no longer tolerate your violations of the terms of our agreement.

A few days later, TTI's trial counsel, Mr. Neill, wrote a letter to CFI asserting that CFI was in default in paying royalties ($21,-989) and franchise fees ($18,360), in opening stores without TTI's written approval, and in increasing initial franchise fees beyond $10,000 without TTI's prior written consent. (D–51.) Neill's letter demanded payment of the $40,349 and threatened to initiate litigation if payment was not made within ten days. TTI has not pursued the claim that CFI breached the contract by raising franchise fees without TTI's consent. TTI's demand for payment of franchise fees was based solely on its assertion that the franchise fee included various turnkey services.

CFI responded on April 30 by filing suit to enjoin TTI from terminating the agreement and to obtain a declaration as to the definition of "initial franchise fee." TTI's counterclaim, filed June 28, 1976, sought a declaration of the parties' rights as to franchise fees, recovery of additional amounts claimed to be due as franchise fees, and a declaration terminating the agreement. TTI did not assert any other breaches as grounds for termination until December, 1977, when it moved to amend its counterclaim.

On May 6, 1976, Ed Craig met with Fraedrick in Boise, Idaho to discuss the differences between their firms. (D–53.) Craig's detailed notes of the meeting indicate that Fraedrick made the statement that TTI did not want cancellation of the agreement, "but only who is right and wrong in the contract" with regard to the franchise fee dispute. (*Id.* at 2.)

In the course of the meeting, Craig asked Fraedrick how important it was for TTI to "know where a franchise goes before it is actually in business." (*Id.* at 3.) Fraedrick's response was that approval was "not too important" in small cities but that it was important for trademark protection in large cities and "around other franchisees." (*Id.* at 4.) Fraedrick further expressed irritation at the fact that he did not receive the agreements before the store was "up and sold." He feared that this procedure created the danger of damage to the trademark and to the operator of the store. (*Id.*)

After Neill's April 9 demand letter, a total of about 52 stores were opened by CFI up to the time of trial. (P–1108, 1096.) TTI claims that 27 of those stores were opened without its prior approval. (D–200.) Of those 27 stores, 21 were located in cities that would clearly fit within the definition of a "small city" or a town.[2] Two of the

---

2. These 21 stores were located in American Falls, Blackfoot, and Soda Springs, Idaho;

Brighton, Canon City, Craig, and Fort Morgan, Colorado; Cody and Evanston, Wyoming;

remaining six stores were located in cities that clearly are not large cities.[3] Only four of the 52 stores opened after this lawsuit began were located in substantial metropolitan areas. These stores were located in Colorado Springs (two stores) and Arvada (suburb of Denver), Colorado and Sparks (near Reno), Nevada.

The time elapsed between opening date and approval date for these four stores was one day (North Circle in Colorado Springs), 14 days (Sparks), 31 days (Mall of the Bluffs in Colorado Springs), and 55 days (Arvada). However, the Arvada and North Circle franchise agreements were forwarded to TTI on May 17, 1977 (P–1144). Since these stores did not open until June 21 and August 2, respectively, TTI had ample opportunity to approve these stores prior to opening. (D–200.) TTI's approval was withheld on these and other stores because of TTI's insistence that it receive its share of the franchise fee prior to approval. (P–1003.) Similarly, the Sparks franchise agreement was in TTI's possession by June 20 (P–925), some two months prior to opening. (D–200.) It was approved immediately upon payment of TTI's share of the franchise fee. (P–927; D–200.)

After this lawsuit was filed, TTI continued frequently to approve new franchises without thorough consideration of their suitability. In 1976 and 1977 TTI approved a number of franchise agreements that failed to specify the store address. (P–900, 902, 908, 940.) It appears that no franchise agreements for new stores were ever rejected. Examination of a large number of TTI's files revealed that 99% of the 176 store files examined did not include a site analysis; 96% did not include building plans; 66% did not contain owners' financial statements; 36% did not specify the store address in the franchise agreement; and 20% did not contain an executed franchise agreement. (P–1126, 1108.) These deficiencies in TTI's system of gathering

and maintaining information are not unique to CFI's area, but appear to be even more prevalent in other areas. (P–1108.) Moreover, these deficiencies exist with respect to numerous stores opened since 1975. As late as 1978, TTI permitted the opening of a store outside the CFI area prior to the execution of a franchise agreement for that store. (P–1057.)

Another factor contributing to the delay in approval of franchises was TTI's sporadic and often arbitrary insistence on receiving various information. Although CFI made a reasonably diligent effort to supply relevant information, it had considerable difficulty satisfying TTI's demands. On December 7, 1976, CFI's general counsel wrote to Fraedrick:

> I agree that there is some misunderstanding as to the kind of information you are personally requesting. As you well know I have spent a substantial amount of time preparing forms and attempting to provide a system whereby Franchise approval could be done with a minimum of paper work and unnecessary effort. I am of the opinion that no form I prepare or program I instigate will meet your requirements and request that you please forward to me a form which specifically states the information you desire in order to make the momentous decision as to whether or not to approve a franchise agreement.
>
> Upon receipt of such information, I will be glad to comply with your request.

(P–996.) On the same date, CFI's general counsel wrote another letter to Fraedrick further expressing irritation at TTI's demands for information regarding three new franchises. The letter stated in part:

> Regarding your request that we provide you with an information sheet containing a full disclosure of all terms of agreement with the franchisee, please be advised that you have been provided with

---

Hamilton, Montana; Elko, Nevada; Delta, Green River, Gunnison, Heber, Kanab, Moab, Nephi, Roosevelt, Springville, and Tremonton, Utah.

3. These cities are Grand Junction, Colorado and Havre, Montana.

information which you had earlier agreed was sufficient.

. . . . .

Please be advised that I have indicated to Craig Food Industries that your requests and demands regarding the approval of franchises are potentially a violation of the contractual arrangement between the parties thereto and may be in fact sufficient grounds to relieve Craig Food Industries of obligations it may have to you.

 In summary, from the beginning of their relationship until mid-1975, the parties operated in an extremely informal manner. Although the agreement required execution of franchise agreements by TTI prior to opening, TTI acquiesced in CFI's practice of opening stores without prior approval. In July, 1975, TTI abruptly announced that it would demand strict compliance with the approval requirement. Thereafter, TTI continued to approve franchise agreements for stores that Fraedrick knew were already in operation at the time of approval. By so doing, TTI waived any claim it may have had that CFI breached the agreement by opening those franchises. In May, 1976, Fraedrick indicated to Craig that prior approval of stores opened in smaller cities was not particularly important to TTI, but that he would insist on approval in large cities. After that time only four of 53 stores opened by CFI without approval were in large cities. As to three of those stores, TTI had ample time for approval prior to opening but withheld approval until CFI remitted TTI's share of initial franchise fees. The record does not indicate when TTI was given the opportunity to approve the fourth store, but TTI asserts that 31 days elapsed from opening to approval. In every case TTI approved the franchises granted by CFI and accepted the benefits therefrom. TTI has neither demonstrated that it has been harmed nor that CFI has benefitted by the opening of stores prior to approval by TTI.

Under all the circumstances present in this case, the court is persuaded that CFI, by opening stores prior to approval by TTI,

has not materially breached the contract. Moreover, TTI's conduct, both before and after this dispute arose, constitutes a waiver of any defaults that may have occurred in the opening of stores without approval. TTI has consistently approved all franchise agreements for new stores and accepted its share of franchise fees, royalty payments, and intangible benefits therefrom without reservation. It frequently had opportunity to approve stores prior to opening but refused to do so for reasons typically unrelated to the suitability of the franchises.

### FAILURE TO SUBMIT ACCURATE INFORMATION

TTI claims that CFI has breached paragraph 4 of the 1971 Agreement by failing to submit accurate information to TTI. That paragraph provides in part:

Prior to the execution of any franchise or license agreement, CTI must submit to Nataco such information as it may request with regard to the contemplated outlet . . . .

 TTI relies upon an incident involving a franchise granted in Hamilton, Montana as a flagrant example of CFI's failure to submit accurate information to TTI. On June 30, 1977, CFI forwarded the Hamilton franchise agreement to TTI for approval. (P–938.) Although the agreement signed by the franchisee stated that the franchise fee was $17,500, the page specifying the franchise fee was removed by Alice Alford, a secretary for CFI, and replaced with a page specifying a franchise fee of $10,000. (P–933; D–91.) Alford sent the altered agreement to TTI for approval, and enclosed an information sheet stating that the franchise fee was $10,000 and that an additional $7,500 was charged for other services. (P–938.) When the executed franchise agreements were returned to CFI, Alford replaced the page showing $17,500 on one copy and sent it to the franchisee. (P–933.) She testified that this procedure was followed at the direction of Guy Murray, who had sold the Hamilton franchise, in order to accommodate the franchisee, who wanted the full turnkey

price stated in the agreement for purposes of obtaining bank financing. Murray and the franchisee had agreed that $10,000 was for the franchise fee and the balance was for other services. (P–933.) TTI was adequately informed of the total charges by means of the information sheet sent on June 30. (P–938.) Although Murray was employed by TTI at the time of trial, he was not called to rebut Alford's testimony that he had directed her to change the pages for TTI approval. Under these circumstances the court is unable to perceive that any deceit was practiced upon TTI in this incident.

In addition to the Hamilton incident, TTI asserts that CFI failed to disclose charges for turnkey services for 34 stores opened from 1975 through 1977. (D–198.) In this regard, TTI relies upon a letter from Fraedrick to CFI's general counsel on November 2, 1976, in which Fraedrick observed that CFI had theretofore indicated the amount of fees received in addition to the basic franchise fee and requested CFI to continue such disclosure. (D–62.) In that letter and in a similar letter dated December 21, 1976, Fraedrick stated that his approval of franchise agreements was subject to full disclosure of all additional charges. (*Id.*; D–68.)

The court has previously held that TTI is not entitled to any portion of the fees received by CFI for turnkey services. Moreover, TTI has failed to demonstrate that it suffered any injury as a result of the nondisclosure of these charges. The court believes the parties would have been in precisely the same position whether or not these charges were disclosed. TTI has never breathed the suggestion that its approval of those franchises was not valid. Instead, it has continued to accept the royalties and other benefits flowing from those stores. Under these circumstances, CFI's failure to disclose was clearly not a material breach of the agreement. Instead, it was merely a technical default apparently asserted as an afterthought in this litigation. Such a default does not warrant termination of the agreement under the circumstances of this case. Moreover, it appears that TTI has not satisfied the requirement of giving CFI notice of default under paragraph 8 of the agreement. Such notice should have been provided since the default asserted by TTI could have been cured by providing the requested information.

## FAILURE TO EXERT BEST EFFORTS TO OPEN NEW FRANCHISES

Paragraph 1 of the 1971 Agreement provides in pertinent part:

CTI will use its best efforts to secure operators in this area.

Paragraph 7 provides for a minimum quota of stores that CFI is obligated to establish in order to keep the agreement in force. It required CFI to establish four stores by January 1, 1973, and four stores each year thereafter until 1980 (total of 32 required by January 1, 1980). Paragraph 13 provides that the agreement shall terminate on June 30, 1980, except that it shall remain in force so long thereafter as the annual gross receipts of stores in the CFI area exceed $5.5 million, as adjusted according to changes in the Consumer Price Index.

TTI claims that CFI has breached the best efforts clause by virtue of its alleged involvement in competing enterprises and certain other circumstances. TTI relies primarily on the fact that CFI established a Mexican fast food store chain known as "Taco Maker" and the claim that Gil Craig's efforts have been divided between Taco Maker and CFI since 1976. The 1971 Agreement does not require Ed or Gil Craig to remain in the employment of CFI. However, paragraph 23 of the agreement prohibits CFI from assigning the agreement without TTI's written consent. Although the 1969 Agreement required Ed and Gil Craig to retain more than 50% of the voting stock of CFI (D–1, ¶ 24), that provision was not included in the 1971 Agreement.

The minimum openings and annual volume requirements of paragraphs 7 and 13 of the 1971 Agreement (D–2) are substantially lower than the levels prescribed by the 1969 Agreement. (*Cf.*, D–1, ¶¶ 7, 14.) The minimum openings quota was reduced by approximately 50%, and the annual vol-

ume requirement by about 30%. The 1969 Agreement had substantially reduced the minimum openings required under the pre-1969 agreements. These reductions in CFI's performance requirements were a central part of the negotiation process preceding the 1969 and 1971 agreements and appear to reflect the parties' assessment of the best efforts requirement in terms of an objective standard.

CFI has surpassed the minimum openings quotas by a wide margin. By the deadline for the first quota of four stores, CFI had established thirteen stores. (P–1107.) The quota for January 1, 1978, was a total of 24 stores. By that time, CFI had opened 91 stores. (*Id.*) Immediately before trial, CFI had opened 97 stores under the 1971 Agreement. Since mid-1976, CFI-franchised stores (not including CFI-owned stores) have continuously exceeded the total number of stores established by TTI in all non-CFI areas since 1960. (P–1097.)

In 1976 and 1977, CFI-inaugurated stores accounted for almost 50% of the total sales volume of all Taco Time stores in existence. (P–1108.) Total sales volume of CFI-area stores exceeded $15 million in 1978. (P–1101.) Thus, CFI will have no difficulty in surpassing by a wide margin the $5.5 million inflation-adjusted annual volume required to avoid termination after June 30, 1980.

These objective measures of CFI's performance provide compelling evidence that CFI exerted its best efforts under the 1971 Agreement. This evidence overwhelmingly shows that CFI has pursued its responsibilities vigorously and successfully. In an area consisting of eight states and portions of two others, CFI has, since May, 1971, generated a total sales volume equal to that generated by TTI since 1960 in an area consisting of the balance of the United States and all of Canada. In light of this comparison, TTI's claim that CFI has not used its best efforts is little short of frivolous.

The basis of TTI's claim regarding the best efforts clause is that CFI established a competing franchise chain called Taco Maker, that Gil Craig has devoted substantial time to Taco Maker and terminated his employment with CFI, that many CFI-area stores failed, that CFI's credit rating is bad, and that CFI challenged the validity of the Taco Time trademark. (TTI Trial Brief at 22.) The trademark challenge, which CFI asserted for a very brief time in the course of this lawsuit, will be discussed in detail below. For the reasons stated in that portion of the opinion, the court is persuaded that such challenge was not a failure of best efforts.

The court is aware of no evidence that CFI had a bad credit rating. Even if such evidence were adduced, it would not sustain the conclusion that CFI had failed to use its best efforts. On the contrary, CFI assumed massive liabilities in guaranteeing leases for land and equipment and extended large amounts of credit to franchisees to assist them in establishing new stores. TTI has totally failed to sustain its burden on this point.

Similarly, the fact that many stores failed does not establish a lack of best efforts on the part of CFI. In connection with many of those stores CFI incurred heavy losses due to its lease guaranty and loan programs. Under such circumstances CFI had every incentive to ensure the success of franchisees and went to considerable lengths to assist them. CFI employed a sophisticated econometric analysis to determine the probable success of new stores. CFI exerted substantial effort in reopening or relocating franchises that failed. The failure of stores was attributable to a large number of factors, many of which could not have been foreseen with any degree of reliability. Stores located in non-CFI areas failed as well. TTI has totally failed to sustain its burden on this aspect of its best efforts claim.

The Taco Maker trademark was developed by CFI in 1976 or early 1977. CFI opened a Taco Maker Mexican fast food store in Los Angeles in January, 1977. In May or June of 1977, CFI elected to abandon the Taco Maker enterprise. Thereafter, a separate corporation was formed to

operate the Taco Maker business, and Gil Craig purchased a controlling interest in it. CFI had no ownership in the Taco Maker enterprise at the time of trial. Taco Maker stores have been established in Los Angeles, Puerto Rico, and Hawaii. Gil Craig's efforts were apparently divided between CFI and Taco Maker during 1977. In February, 1978, he formally resigned his position with CFI and devoted his full attention to Taco Maker. Taco Maker's logo, recipes, and various other characteristics are substantially different from those of Taco Time. (P–1168.)

Thus, the facts supporting TTI's best efforts claim are that CFI created a competing fast food operation and sold it to Gil Craig and others, that Gil Craig divided his efforts for a brief time between CFI and that chain, and that Gil Craig has terminated his employment with CFI. The evidence clearly shows that the Taco Maker efforts were conducted entirely outside the CFI area. The 1971 Agreement does not require Ed or Gil Craig to remain in CFI's employment, nor does it require them to retain any ownership of CFI. The agreement contains no non-competition clause. In view of these circumstances and CFI's aggressive and successful development of its area, TTI's claim that CFI has failed to use its best efforts is plainly without merit.

The conclusion that TTI's best efforts claim is without merit is further strengthened by the testimony of Evan Armstrong, TTI's area licensor for Spokane, Washington and certain other areas. Armstrong's agreement with TTI prohibits him from competing

> with the NATACO in the continental United States of America in the sale of Mexican-type food during the term of this franchise and for five (5) years after its termination.

(P–1092, ¶ 9.) Armstrong testified that he opened competing stores within his licensed area as early as 1976 with TTI's knowledge and without complaint from TTI. On one occasion he bought a TTI store in his area from a franchisee and converted it to a Taco Mejico fast food store. He advertised openly the availability of a Taco Mejico franchise six blocks from an existing Taco Time store in his area. Although the operator of that Taco Time objected, TTI made no effort to enjoin Armstrong's actions at that point. Despite the non-competition clause in Armstrong's agreement with TTI, TTI made no effort to enjoin Armstrong's competitive activities until December, 1977, when TTI filed a counterclaim to Armstrong's suit for a declaration that the non-competition clause was unenforceable. (D–383.)

TTI has never claimed that Armstrong failed to use his best efforts, nor has TTI sought to terminate Armstrong's agreement. In contrast, the activities of CFI and Gil Craig with regard to Taco Maker were conducted entirely outside CFI's licensed area. Moreover, the 1971 Agreement contains no clause limiting CFI's right to engage in competitive activity.

## FAILURE TO HONOR TRADEMARK

TTI claims that CFI has breached the contract by failing to honor and protect the Taco Time trademark and to deal in good faith with TTI with respect to the trademark. TTI asserts that these actions violate an implied covenant of good faith and the best efforts clause in the agreement.

TTI's claim arises out of a claim asserted by CFI in the course of this lawsuit. On December 7, 1977, TTI filed a motion for leave to file an amended counterclaim vastly expanding the scope of this lawsuit. On December 23, 1977, CFI filed a motion for leave to file an amended complaint asserting numerous additional claims against TTI. The fourth count of CFI's proposed amended complaint alleged that TTI had not restricted the use of the Taco Time trademark to authorized users, that Bowles Packaging Co. had filed a suit against TTI alleging that it had been using the trademark since 1969 without express consent of TTI but with its acquiescence, and that the trademark was no longer the exclusive property of TTI. On January 18, 1978, both parties' motions to amend were granted. On January 24, CFI filed its amended com-

plaint, which included the allegations described above in its seventh count.

When TTI learned of CFI's trademark claim, it refused to approve franchise agreements submitted by CFI. (P–55; D–121.) An exception was made, however, with regard to the Layton franchise, which TTI indicated on January 26 that it was willing to approve. (P–55.) On February 6, 1978, Fraedrick approved the Layton franchise. On February 14, he wrote to CFI indicating that TTI would approve franchises if CFI would abandon its trademark claim, agree not to assert such claim thereafter, and acknowledge in writing the validity of the trademark. (D–121.) On February 17, the parties and their counsel signed a stipulation stating that CFI would abandon its trademark claim, that CFI knew of no facts that "would accomplish" a loss of the trademark, that the trademark was valid, and that all prior statements of CFI to the contrary were untrue. (D–122.) In exchange, TTI agreed to discontinue withholding approval of franchises because of the trademark dispute. (*Id.*) On March 7, the trademark claim was stricken on CFI's motion.

Shortly after the stipulation was signed, counsel for CFI became concerned that the admission of untruthfulness in the stipulation created a risk of perjury charges and advised counsel for TTI that the stipulation would not be filed in court. (Tran. of hrg., March 29, 1978, at 22.) On March 29, the matter was presented to the court, at which time Ed Craig testified that he believed the trademark to be valid, that he knew of no facts justifying the conclusion that the trademark was not valid, and that he had relied upon the *Bowles* pleadings in asserting the trademark claim. (*Id.* at 36, 40–41.) Thereafter, TTI resumed the granting of approval of new franchises. Theron Bowles testified that he met with Ed Craig late in 1977 and told him of the *Bowles* suit and said that his attorney had advised him that Bowles Packaging Co. could lawfully use the Taco Time trademark without TTI's permission. Moreover, the Bowles affidavit attached to CFI's amended complaint stated that Bowles Packaging had used the trademark for many years with TTI's acquiescence.

■ In short, TTI's claim that CFI failed to honor the trademark is primarily based on the fact that CFI asserted a legal claim, *i. e.*, that TTI had lost the exclusive right to the trademark. In asserting this claim, CFI relied uncritically on the *Bowles* pleadings and affidavit, and statements made by Theron Bowles to Ed Craig regarding the validity of the trademark. Although such reliance was probably ill-advised, the court finds that CFI made the claim in good faith, apparently desiring to bring all its grievances against TTI before the court. After a short time, CFI abandoned the claim and disavowed any belief that the trademark was not valid. As the court has previously held, CFI's good faith assertion of a legal position or claim regarding the relationship between itself and TTI does not constitute a breach of their agreement. A contrary holding would force CFI into an intolerable dilemma: CFI would be forced to elect between, on one hand, abandoning any claim or position with which TTI refused to agree and, on the other hand, asserting its position at the risk of termination.

■ TTI also asserts that CFI failed to honor the trademark in its dealings with Jens Pedersen. In early 1978, Pedersen, via a corporate entity, had entered into a franchise agreement with CFI. Because of the pending trademark dispute, TTI refused to approve the agreement, and Pedersen demanded a refund of the franchise fee. On March 1, 1978, Ed Craig met with Pedersen and his attorney, Stephen Berg. Craig informed them that the trademark validity was in dispute and suggested that Pedersen operate as a "licensed outlet" rather than a "franchised outlet." Berg testified that Ed Craig told him that TTI no longer had exclusive ownership of the trademark. Craig testified that he did not tell Berg that the trademark was lost or that CFI owned it. Berg's testimony is substantiated by Pedersen's deposition testimony on September 7, 1978. Pedersen testified that Craig

told him at the March 1 meeting that "the trademark was no good." (Pedersen Depo. at 27.) The court is thus persuaded that Craig did in fact tell Pedersen and Berg on March 1, 1978, that TTI had lost the exclusive rights to the Taco Time trademark. This statement was made some twelve days after Craig had signed the stipulation stating that CFI and its principal officers knew of no facts justifying the conclusion that the trademark was not valid. (D–121.) Craig's actions in this regard were reprehensible. They constituted a breach of CFI's implied obligation of good faith under the 1971 Agreement.

This breach, however, must be viewed from the appropriate perspective. Pedersen had signed a franchise agreement and paid CFI some $16,000. When the agreement was submitted to TTI for approval, Fraedrick refused to approve it because CFI had asserted the claim that TTI's trademark was invalid. TTI's counsel stated to the court that such refusal was necessary for the protection of the trademark. (Tran. of hrg., March 29, 1978, at 18.) He explained that TTI must police the mark to protect it and that "there can be no clearer example of a failure to police a mark than to allow someone to deal with it, to market it who has professed that it is invalid." (*Id.* at 18–19.)

In spite of TTI's professed concern for policing the mark, it indicated on January 26, 1978, that it was willing to reconsider approval of a franchise in Layton, Utah on the condition that the franchisees sign a letter acknowledging awareness of the trademark dispute. (P–55.) The franchisees signed the letter, and the Layton franchise was approved by TTI on February 6, 1978. (D–198 as corrected in light of P–55, –20, –1096, –1108.) Although TTI ostensibly granted the Layton approval due to "peculiar circumstances," the court is not persuaded that the circumstances relevant to the trademark dispute were materially different with regard to the Layton franchise from those concerning other franchises rejected by TTI at or about the same time. There appears to be no reason why the type of letter signed by the Layton

franchisees could not have been used in other cases as well. Thus, the court is persuaded that TTI's refusal to approve franchises was not in good faith and was apparently motivated by the desire to coerce CFI into abandoning its trademark claim.

An additional circumstance deserving of consideration is the fact that as of March 1, 1978, CFI had performed a substantial portion of its turnkey obligations to Pedersen in connection with the Whitefish, Montana store. Pedersen was demanding the return of the $16,000 he had paid CFI. In an effort to salvage CFI's expenditures on the Whitefish franchise, Craig proposed that the store be opened as a licensed outlet, apparently to circumvent TTI's refusal of approval. In an attempt to persuade Pedersen to accept this proposal, Craig represented that TTI no longer had exclusive rights to the trademark. As the court has previously indicated, Craig's representation was a breach of CFI's obligation of good faith. Although Craig's behavior was reprehensible, the court finds that this breach was of minimal significance in view of the total context in which it was made. While CFI was under an obligation to exert its best efforts to sell franchises, TTI was refusing, in less than good faith, to approve new franchises. Such refusal led to the difficulty with the Whitefish franchise. Craig's representation that the mark was lost and other statements made on March 1 were directed toward the performance of CFI's best efforts obligation and toward salvaging its investment in Whitefish.

Of particular significance is the fact that Craig's breach of good faith with respect to the trademark was an isolated occurrence, resulting in no harm to TTI. The evidence clearly shows that CFI generally made diligent and good faith efforts to assist TTI in protecting the trademark. (P–967, 961, 960.) Although CFI used the Taco Time logo on its letterhead for at least five and one-half years with TTI's knowledge and acquiescence (P–1128), CFI promptly discontinued such use at TTI's request in July, 1975. (D–39, 43.)

In view of the totality of circumstances, the court is persuaded that Craig's representation to Pedersen that TTI had lost its trademark was not a material breach of the agreement. It was a breach of minimal significance when viewed in the context of contemporaneous events and the relationship between CFI and TTI. It does not justify the extreme remedy of termination of the agreement.

## FAILURE TO COOPERATE WITH TTI IN RESISTING A CHALLENGE TO THE TRADEMARK

TTI alleges that CFI breached paragraph 26 of the 1971 Agreement by asserting the trademark claim discussed above. Paragraph 26 provides:

CTI must notify Nataco in writing of any infringement of the trademark "TACO TIME" or of any unfair competition which interferes with the relationship of the parties hereunder or the relationships between CTI and franchised operators. Such notification shall contain all details concerning such infringements or unfair competition that are available to CTI. In the event any litigation is instituted with respect to any infringement or unfair competition as herein mentioned, Nataco shall retain complete control over the same. CTI will cooperate with Nataco to the extent necessary in connection with any such infringement, unfair competition or litigation.

TTI couches its claim that CFI breached this paragraph in the following terms:

While Bowles Packaging did not actually challenge the trademark, "Taco Time," CFI claims that they thought it did. If that is true, they had an obligation to cooperate with TTI in resisting it. Instead, not only did they not cooperate with TTI, they joined in Bowles' supposed challenge.

(TTI Trial Brief at 26.)

This claim by TTI constitutes a strained effort to restate the trademark dishonor claim in terms of a breach of paragraph 26 of the agreement. The court is doubtful that paragraph 26 was intended by either party to preclude CFI from asserting a colorable claim in court against TTI with respect to the validity of the trademark. Moreover, the court has heretofore, in this opinion, rejected TTI's contention that CFI breached the agreement by asserting the trademark claim.

## TERMINATION

TTI's primary objective in this lawsuit is to obtain a declaration that CFI has breached the 1971 Agreement and that TTI is entitled to terminate the agreement in accordance with paragraph 8 thereof. Paragraph 7 of the agreement establishes minimum openings requirements and grants TTI the option to terminate the agreement if such requirements are not met within 90 days after TTI gives CFI written notice of termination. Paragraph 8 provides that, in addition to the foregoing power of termination:

Nataco shall have the right to terminate this agreement upon the default of CTI in any of the other terms and provisions hereof; provided, however, that such default shall not be considered to have occurred until such time as Nataco has delivered to CTI in writing a notice specifying the nature of the default or defaults, and granting to CTI a period of ten (10) days from and after the giving of such notice within which to correct or remedy any such default or defaults.

With respect to the enforcement of this provision, the parties urge diametrically opposite legal standards upon the court. TTI contends that its contractual power of termination under paragraph 8 may be exercised without regard to materiality of the breach, relative hardship to the parties, or any other consideration not expressly provided for in the agreement. (TTI Trial Brief at 6.) CFI, on the other hand, argues that TTI is not entitled to termination unless CFI has breached the contract to a degree that prevents attainment of the parties' objectives in making the agreement. (CFI Trial Brief at 22.) In support of this position, CFI relies upon authorities dealing with rescission of contracts. Since rescis-

sion is not at issue here, those cases appear to be inapposite. CFI also contends that the termination clause is unconscionable and therefore unenforceable. During final arguments, CFI argued that termination should not be permitted because it would result in an inequitable forfeiture and the unjust enrichment of TTI.

The parties agree that the law of Oregon governs their rights and duties under the 1971 Agreement. TTI, however, has failed to cite a single Oregon case in support of the position that it is entitled to terminate the contract strictly according to paragraph 8 without regard to the significance of CFI's default or the extent of the forfeiture that would result. Instead, TTI relies primarily upon *Home Reader Service, Inc. v. Grappi*, 446 S.W.2d 95 (Tex.Civ.App.1969) and *Ritter v. Perma-Stone Co.*, 325 P.2d 442 (Okl.1958). Those cases are claimed as holdings that a termination clause in a franchise agreement should be enforced according to its terms, regardless of the materiality of the breach. Neither case addressed the question whether a termination clause should be strictly enforced when termination would result in a substantial forfeiture. Moreover, those cases dealt with the relationship between a franchisee and a franchisor, while the present controversy arises out of a relationship having an entirely different character. For these reasons, those cases are of little value in the present context.

The court has reviewed the law of Oregon as to the enforceability of contractual termination provisions. Most of these cases deal with vendor-purchaser contracts. Although the vendor-purchaser relationship is substantially different from the relationship of TTI and CFI, the principles announced in those cases provide useful insight into the law likely to be applied by the Oregon Supreme Court in a situation such as the present one.

In *Williams v. Barbee*, 165 Or. 260, 106 P.2d 1033 (1940), the Oregon court affirmed the trial court's decree quieting title to certain land in the vendors of timber on the land. The vendors had entered into a con-

tract for the sale of growing timber under which the purchasers were obligated to log eight million feet of timber during the first year, eight million during the second year, and the balance during the third year. The contract contained a termination clause giving the vendors the option to terminate the agreement upon any default of the purchasers after 30 days' written notice of default. The contract provided that upon termination the remaining timber and the purchasers' logging equipment would become the property of the vendors. At the end of the first year, the purchasers had logged only 2.7 million feet. The vendors thereupon gave notice of default and notice that the contract would be terminated in 30 days.

The court held that the forfeiture provision was valid and that "[t]he language found in the forfeiture provision necessarily determines the right of forfeiture." 106 P.2d at 1039. The court further held that:

It is fundamental that equity will not lend its aid to an attempt to enforce a forfeiture. But that is not the purpose of this suit. The contract in the instant case was terminated pursuant to its provisions; and the forfeiture was an accomplished fact at the time that the suit was instituted.

*Id.* (citation omitted). The *Williams* court acknowledged the rule that equity will refuse to "relieve against a forfeiture [if] no equitable grounds of relief from the forfeiture exist." *Id.* at 1040. It noted that the purchasers had not affirmatively requested relief from the forfeiture, but added:

[W]e think that, since the [vendors] are here invoking equitable relief, the question is properly before us for determination.

*Id.* In considering the equitable arguments raised by the purchasers as excuse for their failure to perform, the court said:

The heavy losses sustained by the [purchasers] are regrettable, but they were not due to any fault of the [vendors], who did no more than act upon their legal rights in the face, *not of a technical or*

*trivial, but a very substantial breach* by the [purchasers].

*Id.* at 1041 (emphasis added).

In a more recent case, the Oregon Supreme Court reaffirmed the rule that equity will not declare a forfeiture and added that

although under proper circumstances equity will recognize that a forfeiture at law has been previously accomplished, there is no evidence that such a forfeiture has been effected in this case. The contract of sale merely gave the vendor the option to declare a forfeiture and was not self-executing.

*Howard v. Jackson,* 213 Or. 447, 324 P.2d 757, 763 (1958).

In a 1972 decision, the Oregon court quoted *Williams* with approval and demonstrated considerable hostility toward contractual forfeiture provisions. In *Roth Development, Inc. v. A. R. John General Contractors, Inc.,* 263 Or. 561, 503 P.2d 493 (1972), the court affirmed the dismissal of a quiet title action, holding that it was an action to enforce a forfeiture. The *Roth* court described the action in these terms:

This is a case in which the right of a party to a contract to enforce its provisions, as agreed upon, conflicts with the long-standing abhorrence by courts of equity toward the enforcement of contract provisions which result in forfeitures.

*Id.* at 496. The court added:

Although the law will not assist in the vivesection of the victim, it will often permit the creditor to keep his pound of flesh if he can carve it for himself.

. . . . .

It is a well-recognized rule that because the forfeiture of rights under contracts is not favored, contract provisions which may result in forfeitures are to be construed liberally in favor of the party against whom such a forfeiture may be claimed.

*Id.* The *Roth* court also reaffirmed the rule that "equity will never declare a forfeiture and that there are, in fact, no exceptions to that rule." *Id.* at 499.

In the present case, there can be no doubt that TTI is urging this court, sitting as a court of equity, to declare a forfeiture of massive proportions. Paragraph 9 of the 1971 Agreement provides in pertinent part:

In addition to the cancellation of all of CTI's rights and privileges hereunder, the termination of this agreement shall automatically terminate all of CTI's rights with regard to all franchised outlets. From and after the date of such termination, Nataco shall perform all of the duties and obligations of CTI and shall have all of its rights under the provisions of all franchise agreements covering franchised outlets.

The parties are in complete agreement that this language requires, upon termination, forfeiture of CFI's share of royalties from franchised stores as well as forfeiture of CFI's right to license the Taco Time trademark. In 1978, TTI's share of royalties from CFI-area stores was approximately $220,000. (P–1104.)[4] Since TTI received about one-third of total royalties, CFI's share in 1978 would have been about $400,-000. Dr. Jacox testified that the net present value of the future stream of royalty payments to which CFI would be entitled over the next 30 years (absent termination) is from six to ten million dollars. (P–1142.) This figure does not take into account CFI's loss of income in the form of royalties and franchise fees from new stores that could be opened by CFI if the agreement remained in effect.

TTI is not asking the court to recognize that a forfeiture has already been accomplished. Obviously, no forfeiture has occurred. The contract has not been terminated, and the parties continue to perform thereunder. TTI has asked the court to decide whether CFI has breached the contract and whether TTI is entitled to termination. Thus, TTI is clearly asking the court to declare a forfeiture. Since this court is here sitting as a court of equity and the controlling law provides that "equity

4. A percentage of this total consists of royalties from licensed outlets, *i.e.,* CFI-owned stores.

will never declare a forfeiture," it does not appear that TTI would be entitled to a declaration that the contract is terminated even if the court had found that all of the claimed breaches had been committed by CFI.

This court, however, is uncertain whether the rule that "equity will never declare a forfeiture" would be strictly applied by the Supreme Court of Oregon in the present context. Commendably, TTI has resorted to the courts for a resolution of the conflict between itself and CFI. In view of the complexity of the relationship of the parties, the involvement of third parties, and the magnitude of the interests at stake, any other course, other than a reasonable settlement, would have been foolish. Under such circumstances, categorically to deny relief on the basis of a mechanical rule that equity will never declare a forfeiture would abdicate the role of a court of equity.

■ The court is accordingly persuaded that its appropriate function in this case is not to rely upon rigid rules but to weigh the equities to determine whether termination of the agreement is fair and reasonable in view of the nature of the breaches committed by CFI, the magnitude of the forfeiture that would result from termination, the conduct of TTI, and other relevant circumstances. This court believes that the Supreme Court of Oregon implicitly recommended this approach in the *Williams* and *Roth* decisions. In both cases that court ultimately justified its decisions by considerations of equity.

The court has found only one case dealing with enforcement of a termination clause in the context of a relationship similar to that of TTI and CFI. In *Burger King Corp. v. Family Dining, Inc.*, 426 F.Supp. 485 (E.D. Pa.1977), *aff'd without opinion*, 566 F.2d 1168 (3rd Cir. 1977), Burger King sought termination of an exclusive territorial franchising agreement for Family Dining's failure to open the minimum number of stores required by the agreement. The trial court granted a motion for involuntary dismissal at the conclusion of Burger King's case. It found Family Dining's position that "the termination provision should be found inoperative because otherwise it would result in a forfeiture" to be compelling. *Id.* at 491. The court held that

if Family Dining were forced to forfeit the right of exclusivity it would lose something of incalculable value based on its investment of time and money developing the area, the significant risks assumed and the fact that there remains some 76 years of exclusivity under the Territorial Agreement. Such a loss would be without any commensurate breach on its part since the injury caused to Burger King by the delay is relatively modest and within definable limits. Thus, a termination of the Territorial Agreement would result in an extreme forfeiture to Family Dining.

*Id.* at 494–95. Thus, the court's approach was to weigh the significance of the default against the gravity of the forfeiture. The only forfeiture faced by Family Dining was the loss of the *exclusivity* of its right to open stores in a two-county area. In contrast, the forfeiture sought by TTI in the present case is of staggering proportions. CFI would not only lose exclusivity in a ten-state area, it would also forfeit the right to a virtually assured income stream whose present value is in the millions of dollars.

■ Turning to the pertinent considerations of equity, the court recognizes the strong interest of TTI in enforcing its contract as agreed upon. Although this interest must be carefully protected by the courts, it may be diluted by other factors. One such factor is the substantive fairness of the agreement. CFI contends that the termination provision is unconscionable. The court, however, cannot agree that the termination clause is not enforceable under any circumstances. Although the termination provision is probably not unconscionable, the oppressive nature of the entire agreement is a significant factor influencing the court's exercise of equitable power.

A thorough familiarity with the 1971 Agreement and the standard form franchise agreement prompts the court to observe

that those agreements, if literally enforced, would grant TTI a license to oppress both CFI and its franchisees. The franchise agreement is obviously an adhesion contract. The 1971 Agreement was negotiated under a threat that TTI would terminate the 1969 Agreement. Its terms were almost unilaterally dictated by TTI, and it was drafted by TTI's attorney. It expressly requires "strict adherence" to its terms by CFI. It requires written execution of the franchise agreement by all parties prior to the opening of a franchised store. It requires CFI, prior to such execution, to submit such information as TTI may request regarding the proposed store. Both it and the standard franchise agreement require strict adherence by franchisees to the franchise agreement and the "TACO TIME Operator's Manual" and permit termination of franchise agreements upon 30 days' notice of default. TTI reserves the right, in its sole discretion, to modify the manual at any time. Such changes are binding on all store operators. (Franchise Agreement, ¶ 5.) The 1971 Agreement allows TTI to terminate it for any default not cured within ten days after notice of default. It requires CFI to submit monthly financial statements, volume reports, and numerous other items of information. Virtually every provision in the agreement is for TTI's benefit and protection.

TTI, however, did not require strict adherence, but instead dealt with CFI and franchisees in a "loose and easy" manner for over four years after the 1971 Agreement was signed. At the end of June, 1975, Fraedrick expressed elation at CFI's expansion and a desire to view a new modular store (none of which had been approved) in operation during his visit to Utah the following week. When he went to Utah on July 8, Fraedrick "caught Ed Craig red-handed" at the scene of a new modular store open without TTI's written approval. The surprise and displeasure expressed by Fraedrick at that time regarding CFI's

opening of stores without written approval appears to have been more calculated than genuine. From that time forward, Fraedrick's dealings with CFI displayed extreme inconsistency. At times he demanded letter-strict compliance with the written agreement, while at other times he clearly acquiesced in many instances of non-strict performance by CFI.

Also in July, 1975, TTI asserted, for the first time, that it was entitled to 10% of CFI's turnkey package charges. TTI has repeatedly shifted its position on this point, often claiming 10% of the entire turnkey price, at other times 10% of some charges but not others of a similar nature, and at one point 10% of CFI's profit on some turnkey goods and services. TTI attempted, by threats of termination, to coerce CFI into paying the sum demanded by TTI. In response to threatened litigation, CFI initiated this lawsuit, seeking only a resolution of the franchise fee dispute. Immediately thereafter, Fraedrick informed Ed Craig that TTI did not want termination of the agreement but only a resolution of the franchise fee question. (D–53 at 2.) TTI's counterclaim requested termination but alleged only one breach by CFI: failure to pay the proper share of franchise fees.

In reliance on the representation that TTI did not want termination, CFI continued its aggressive and successful franchise sales campaign, employing the turnkey concept extensively. CFI continued its pattern of non-strict compliance with the agreement, and TTI continued to accept CFI's performance and the fruits of CFI's efforts. In February, 1977, representatives of the parties met to discuss settlement of the lawsuit and a merger of the two companies. At that point a tentative agreement was reached to settle the lawsuit and consider more fully a merger of TTI and CFI. With regard to a ten-day termination letter issued by TTI the previous month, Fraedrick told CFI to pay the royalties as soon as possible.[5] A final settlement agreement

5. This testimony was proffered over TTI's objection. The court is persuaded that it should be admitted to show a waiver by TTI of compliance with the January, 1977, ten-day letter and to rebut TTI's contention that CFI was seeking

to "sever its ties" with TTI. In addition, it should be admitted as evidence of equitable considerations relevant to the termination question.

had not been formulated as of July, 1977. (P–832; D–86.) At some point thereafter, settlement efforts were apparently abandoned.

In December, 1977, TTI launched a new offensive by moving to amend its counterclaim to allege some 15 breaches in addition to the single breach alleged at the outset of the litigation. CFI countered by moving to amend its complaint to allege a large number of claims against TTI. Both motions were granted in January, 1978. At about that time TTI refused to approve new franchises, ostensibly because CFI had asserted a claim challenging TTI's trademark. TTI, however, betrayed the insincerity of this position by approving the Layton franchise in February, 1978.

CFI thus found itself on the horns of a dilemma. It was bound to exert its best efforts to procure franchisees, yet it knew that TTI would not approve new franchises. Such refusal to approve franchises subjected CFI to possible liability to persons whose previously signed franchise agreements had not yet been approved. That dilemma was resolved when CFI abandoned its trademark claim in return for TTI's promise to resume approval of franchises. For CFI, however, a serious dilemma remained. Still bound by the agreement, CFI was required to perform thereunder while TTI was vigorously seeking termination. Termination would result in a forfeiture of most of the fruits of CFI's efforts, both before and after the commencement of litigation.

As it had done previously in 1975, 1976, and 1977 when confronted with the threat of termination, CFI continued its best efforts to establish new franchises. TTI has continued to accept CFI's performance and the fruits thereof. Since mid-1975, when TTI suddenly altered its course by insisting on strict compliance, CFI has established in excess of 75 new franchises. During the same period, TTI, with a much larger area, has established only about 30 stores, less than half of which were franchised stores. (P–1100, 1105.)

Relying primarily on the minutes of a meeting of CFI's board of directors on October 21, 1975 (D–42), TTI contends that CFI has acted in bad faith and with the desire to "provoke a confrontation" and sever its ties with TTI. The great weight of the evidence, however, directly contradicts this contention. More persuasively than the protestations of CFI witnesses that CFI did not take steps to provoke a confrontation or sever its ties with TTI, the vigor, creativity, and success of CFI's sales efforts after October, 1975, compel the conclusion that CFI sought in good faith to preserve its relationship with TTI and to demonstrate its value to the Taco Time system.

The evidence does not demonstrate that CFI and TTI are no longer able to cooperate or that the element of trust in their relationship has been destroyed. On the contrary, the very fact that the parties have, with great success, continued their performance during the past two and one-half years, despite the pendency of this litigation, strongly suggests that there is no significant barrier to the continuation of the mutually beneficial and economically productive relationship of CFI and TTI.

Another factor relevant to the termination question is the extent to which CFI has incurred potential liabilities in the course of developing its area. In connection with its turnkey program, CFI customarily guaranteed leases and sold goods to franchisees on credit. CFI's potential losses on these lease guaranties and loans is uncertain, but appears to be substantial. CFI is heavily dependent upon future royalty income from franchisees to recoup any losses suffered as a result of its lease guaranties and loans. Termination would thus deprive CFI of its principal means of covering such losses.

In light of the foregoing factors and other substantial equitable considerations disclosed by the evidence, the defaults of CFI, whether viewed individually or collectively,

**550**

are not materially significant. TTI has abandoned five of the sixteen assertions of breach alleged in its amended counterclaim. The court has thoroughly examined the evidence regarding the remaining eleven allegations of breach and has determined as to all of them that TTI has failed to establish a material breach of the 1971 Agreement. As to nine of those claimed defaults, the court has determined that TTI failed to establish any default by CFI or that TTI has waived any default that may have occurred. The court found that CFI failed on some occasions to pay royalties "forthwith" and on one occasion to act in good faith with regard to the Taco Time trademark. The court further found that these defaults by CFI were of minimal significance in view of the totality of the circumstances.

▇ In summary, the ultimate issue in this case is whether or not TTI is entitled to termination of the 1971 Agreement, either under paragraph 8 thereof or under general rules of contract law. Since no material breach of the agreement has been committed by CFI, termination is not available under common law contract rules. Termination under paragraph 8 is governed by the express terms of the agreement. TTI thus urges that it is entitled to termination upon any default by CFI, however trivial, if the default is not cured within ten days of the notice of default or is not a curable default. TTI contends that the degree of forfeiture is irrelevant. At the opposite extreme, the applicable state law appears to hold that equity will never declare a forfeiture. Closer analysis of the law, however, suggests that equity may declare a forfeiture under a contractual termination clause, but only upon a substantial breach and only in the absence of adequate equitable grounds for relief from forfeiture. In this case, the court has determined that the defaults committed by CFI were not substantial but were highly insignificant under the circumstances. The court has further determined that equitable considerations weigh heavily against termination of the agreement. Therefore, TTI is not entitled to termination of the 1971 Agreement.

## LITIGATION EXPENSES

▇ Both parties have requested an award of attorney's fees and other costs of the present litigation pursuant to paragraph 22 of the 1971 Agreement, which provides:

> In the event that an action at law or suit in equity is brought to establish, obtain or enforce any right by either of the parties to this agreement, the prevailing party in such suit or action, both in the trial and appellate courts, shall be entitled to a reasonable attorney's fee to be recovered from the other party as well as that party's costs and disbursements incurred in such suit or action.

This provision is enforceable and is applicable to the present lawsuit.

Inasmuch as TTI's primary objective in this lawsuit was to obtain a decree terminating the 1971 Agreement, nearly all of the issues raised by TTI were directed to the termination question. CFI was clearly the "prevailing party" as to the termination question and all issues subsidiary thereto. Accordingly, CFI is entitled to recover the entire amount of its costs and reasonable attorney's fees incurred in this action, with three exceptions: CFI should not recover its costs and legal fees incurred in pursuing its claim that the Taco Time trademark was invalid, its claims of breach that were abandoned at trial, or its claim for additional royalties based on the royalty percentage dispute. As to those three matters, TTI was the prevailing party. Therefore, TTI is entitled to recover its reasonable attorney's fees and costs incurred in defending against those claims and in asserting its "claim" for reformation.

In the event that the parties are unable to agree as to their respective liabilities for litigation expenses on the basis of the foregoing determination, the court will entertain a motion, upon a proper factual showing, to assess costs and attorney's fees.

IT IS HEREBY ORDERED that entry of judgment shall be deferred until such time as the amounts of litigation expenses to be awarded have been determined.

IT IS FURTHER ORDERED that counsel for CFI shall, within 30 days of receipt of this Memorandum Opinion, submit to the court a proposed form of judgment setting forth the amount of unpaid royalties to which TTI is entitled, together with appropriate interest thereon. Such document should be approved as to form by counsel for TTI.